**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| GARLAND HALL, unmarried individual, | No. 83127-5-I |
| Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| JOHN L. SCOTT REAL ESTATE, a Washington corporation; BILL STERN, an individual, and KIM STEVENSON, an individual, | |
| Respondents. | |

BIRK, J. — Garland Hall sold his Sammamish residence to Sammamish Town Center Acquisitions LLC (STCA). Bill Stern and Kim Stevenson, through John L. Scott Inc.,[1] were his real estate brokers for the transaction. Hall did not close on time, leading to a lawsuit by STCA for specific performance requiring him to close. STCA prevailed in the lawsuit and held Hall responsible for the costs of moving Hall's remaining personal property, environmental remediation, and attorney fees and costs.

Hall filed a lawsuit against John L. Scott, Stern, and Stevenson (collectively JLS) asserting claims for breach of contract, violation of chapter 18.86 RCW, misrepresentation, and violation of the Washington Consumer Protection Act (CPA), chapter 19.86 RCW. The superior court granted JLS's motion for summary

---

[1] Documents in the record suggest that the name of the company is "John L. Scott Inc." so that is how we refer to it.

Citations and pin citations are based on the Westlaw online version of the cited material.

judgment, dismissed Hall's lawsuit, and awarded attorney fees and costs to JLS. Three of Hall's claims are properly before this court, breach of duties under chapter 18.86 RCW, violation of the CPA, and fraudulent misrepresentation. We conclude the trial court properly granted summary judgment to JLS on Hall's claims. However, we conclude that on the facts presented the trial court was required to address segregation of JLS's attorney fees based on those claims for which attorney fee recovery was allowed. Fee recovery was allowed only on Hall's breach of contract claim, but not his claims for breach of duties under chapter 18.86 RCW, violation of the CPA, and misrepresentation.

We affirm dismissal of Hall's claims and remand for recalculation of attorney fees. Because the only claim supporting attorney fee shifting is not before this court, we decline to award JLS attorney fees on appeal but award costs to JLS under RAP 14.1(c).

I

Because we review the trial court's order granting summary judgment to JLS, we accept Hall's competent evidence as true and recount the facts in the light most favorable to Hall. Young v. Key Pharms., Inc., 112 Wn.2d 216, 226, 770 P.2d 182 (1989); Davis v. W. One Auto. Grp., 140 Wn. App. 449, 455 n.1, 166 P.3d 807 (2007) ("On Summary judgment, the court is only allowed to consider competent evidence.").

In 2002, Hall acquired a 1.39 acre property located at 22417 Southeast 4th Street, Sammamish, Washington (Sammamish Property). Bordering the

2

Sammamish Property's west side was the 2.77 acre Dahners[2] family property. To the east lay Urban and Diana Masset's 4.39[3] acre property. After the city of Sammamish had rezoned the area to build a town center, Hall received certain offers from interested buyers.

Bill Stern and Kim Stevenson, through John L. Scott, were real estate brokers in the Sammamish area.

Hall met Stern in person in 2013. Hall asserts that Stern approached him in relation to the town center project. On April 26, 2013, Stern e-mailed Hall about a developer who was interested in buying Hall's property.

On August 2, 2013, a developer, Intracorp,[4] sent a letter of intent[5] to Stern for a purchase and sale agreement concerning Hall's property. Hall signed that letter of intent the following day. Hall and Stern discussed a counteroffer, and on August 16, 2013, Stern e-mailed Hall the last page of the letter of intent asking for three sets of his initials with dates. In the same e-mail, Stern noted that Jason Dahners signed a letter of intent that afternoon. Hall initialed and dated the

---

[2] The record referred to a number of people that appear to be related, David and Geri Dahners, Karen Dahners, and Jason and Joyce Dahners. The record is unclear as to property ownership and how many properties are involved, but it appears there are at least two separate properties involved. Because of these ambiguities, we refer to the property generally as the "Dahners family" property and specifically by the name of the individuals in the record.

[3] The record indicates that the Massets' property is either 4.3 acres or 4.39 acres.

[4] The record does not indicate the full name of this company and it is referred to variously as "Intracorp" and "Intercorp." We refer to it as "Intracorp" for consistency.

[5] The letter of intent was from IS Property Investments LLC, which was also identified as the buyer. But the parties refer to the buyer as Intracorp, so we follow suit.

counteroffer to the letter of intent the next day. In the letter of intent, the "Agency and Commissions" provision stated, "Seller is represented by Broker William M. Stern of John L. Scott Real Estate. As a commission, Seller agrees to reimburse Broker the sum of 4% of any proceeds received by Seller."

In an e-mail dated October 4, 2013, Stern advised Hall to consult an attorney about selling his property and introduced him to attorney Camille Ralston. Hall testified at his deposition that he was encouraged to consult an attorney. Hall consulted with Ralston in 2013 by telephone about reviewing a contract to sell his property to a developer. Although Hall stated he believed Ralston to be an excellent attorney, he did not retain Ralston to represent him. On November 13, 2013, Stern sent an e-mail to Hall, the Massets, and Jason Dahners informing them about the status of negotiations with Intracorp. Stern wrote, "It's clumsy for me to tell a prospective buyer that I am representing you when I don't have anything 'official' in writing." No agreement was ever reached with Intracorp.

As early as January 2014, there is evidence Stern had learned and disclosed to a potential buyer that Hall desired to receive at least as much per acre as the Dahners family in any sale and that Hall desired money upfront to clean up the property.

On January 8, 2014, Stern sent an e-mail to Hall and several of his neighbors, including the Dahners family and the Massets. Stern notified the group that he and Stevenson were meeting with a developer and the developer asked the brokers to give "a brief tour of the properties in our quadrant after that meeting."

4

About a month later, Stern and Stevenson discussed among themselves possible sales to "Orcas Development." In February 2014 Stern and Stevenson internally discussed the mechanics of any aggregation of sales of individual properties, including the danger that Stern and Stevenson could appear to represent the buyer and the difficulty of facilitating deals between the sellers and Orcas in the event the sellers each retained their own legal counsel, instead of retaining one attorney to represent all sellers. In August 2014 Stern and Stevenson discussed the solution of locating a single lawyer—such as Ralston—who could represent all the sellers.

On May 13, 2014, Stern sent an e-mail to undisclosed recipients, including Hall, which made it clear that Stern and Stevenson were working with multiple potential sellers. Stern stated that the previous December, he and Stevenson had been approached by a large developer after receiving a referral from the city of Sammamish.

On September 8, 2014, Stern e-mailed Hall to inform him that he met with the principal for Orcas, a principal of which formed STCA with Matt Samwick. Stern acknowledged that he had promised to get back to Hall with the results of the meeting, and Orcas was interested in purchasing the remaining portions of the town center that had not been sold.

On September 16, 2014, Stern reviewed a proposed purchase and sale agreement Hall received from a developer and advised against it. Stern's stated reasons for advising against the offer included the unnecessarily favorable temporal and liability terms for the developer and the developer using "net usable"

5

in the description of Hall's land. Stern also said, apparently in reference to an agent involved in the proposed transaction, "He wants you to pay him 5% and will be representing the buyer? I've already agreed to represent you and would charge 4%, the same as your neighbors."

On October 14, 2014, Stern sent an e-mail to Hall to advise that he met with the principal for Orcas along with its financing source. Stern noted that Orcas planned approximately three phases of assemblages of the remaining land parcels available in the town center project area. At that time, Hall's Sammamish Property was not included in the first phase and Stern stated he would keep Hall informed of any additional changes.

On November 4, 2014, Stern sent an e-mail to Hall and the Massets, regarding Orcas. Stern advised that he and Stevenson had been "working with Orcas Development for about a year." He indicated, "they want to proceed," and would have offers to present "next week" for "17 to 20 parcels." Stern told Hall, "[w]e've given them our estimate of what we think the property is worth."

On November 8, 2014, Stern and Stevenson discussed amongst themselves edits to a forthcoming e-mail to multiple potential sellers in connection with negotiations about sale terms with a potential buyer. Stevenson proposed changes, which she attributed to wanting to avoid implying that they represented the buyers or implying that they knew the sellers' individual contract expectations.

By November 9, 2014, at least one extensive e-mail between Stern and STCA shows that Stern was negotiating the terms on which STCA would acquire several properties within the proposed town center development. Stern requested

6

that an additional paragraph be added regarding a facilitation fee paid by the buyer to JLS, noting that it would need to be disclosed to the sellers. The e-mail reflects that counsel for Stern's company was checking for conflicts of interest. In contemplating multiple sellers selling to STCA on the same terms, a November 11, 2014 e-mail discusses that sellers would have an opportunity for legal counsel to review the sale terms, but their counsel could not make changes to the terms.

In another e-mail dated November 11, 2014, Stern suggested to Stevenson and Samwick the best sequence in which to present the STCA proposal to potential sellers. Stern hoped to capitalize on his assessment of which potential sellers would be influenced by their neighbors to maximize participation in the group selling their properties to STCA. Hall is included among the sellers in the anticipated sequence, along with the Dahners family and the Massets.

On November 15, 2014, Stevenson sent an e-mail to undisclosed recipients with Stern copied.[6] The e-mail reflected the changes Stern had discussed with Stevenson about the implications of their e-mails to the group of prospective sellers. The e-mail disclosed that Stern and Stevenson had been approached by an interested buyer "nearly a year ago." The e-mail disclosed that they had "spent this past week negotiating" with STCA. Stevenson advised that STCA had shown interest in the properties "for several months" and that their interest covered "25+/- owners." This was after Stevenson and Stern had "gone through several

---

[6] The record shows that Hall forwarded this e-mail to his present counsel Mark Perez on May 9, 2021. In his June 7, 2021 declaration, Hall testified that he had "no specific recollection" of ever receiving Stevenson's November 15, 2014 e-mail, but reviewed it "because my attorney asked me to."

7

developers." The e-mail adverted to the individual sellers having different factors that were important to them in potential transactions. Stevenson outlined expectations that a buyer would need to put up cash in a "short time frame," structure pricing according to sellers' "personal desires," and "front" money so that sellers could "pay for your attorney to review and approve" the sale agreement. The e-mail requested the opportunity to meet with the prospective sellers.

On November 22, 2014, Stevenson privately cautioned Stern again on the nature of the information, such as pricing, he should share with potential sellers. Stevenson also warned about disclosure regarding Samwick, who she states had been subject to "disbarment." She expressed concern that if the sellers were told too little about Samwick, and later conducted a simple internet search, the sellers might perceive Stern and Stevenson as lying, ignorant, or trying to cover for Samwick. Stevenson recommended "not to have anything in writing (in an email) except for 'Thank you's' and delivery of documents."

In December 2014, Stern called Hall to discuss the possibility of selling his Sammamish Property to STCA. Hall told Stern he did not want to sell and did not have to sell the property.

Nevertheless, Hall met with Stern three times in December 2014. On December 12, 2014, Hall signed a form 47 seller representation agreement (SRA) with JLS and a letter of intent (LOI) to sell his property to STCA. The SRA included a clause under which Hall agreed to pay JLS compensation of four percent of the sale price for their representation in the sale of the Sammamish Property to STCA. Hall acknowledged through the SRA that JLS would not market his property

8

through the Northwest Multiple Listing Service and this potentially relinquished an increased likelihood of receiving a fair market value for the property. The SRA created an agency relationship between Hall and JLS.

During one of the three meetings, Hall met with Stern and representatives from STCA. During that meeting, Stern asked Hall if he had any questions that he would like to ask an STCA representative. According to Hall's later testimony, he did not ask any questions because he did "not want to embarrass Bill Stern" and believed the opportunity to ask was chilled because of a confidentiality requirement, which was stressed at this meeting. Hall did not feel comfortable telling STCA about any concerns about selling his property, and so did not ask STCA whether they were entering any agreement with the Dahners family or mention any concerns he had about selling the Sammamish Property.

At the third meeting, Hall informed Stern that it would be impossible for Hall to enter into a real estate contract. Hall was primarily concerned about a knee injury that was deteriorating and causing him pain. Additionally, Hall was concerned about timely clearing his property of a volume of personal property, consisting mostly of audio equipment and collectible cars. Hall did not specifically discuss these issues because he believed that Stern was already aware of them and because, he says, Stern took over the conversation.

Hall later testified that at one of these December 2014 meetings, Stern told Hall that he would be getting the same deal as the Dahners family was getting.

After all three meetings, on December 22, 2014, Hall signed a Residential Real Estate Purchase and Sale Agreement (PSA), and Addendum No. 1

9

(Addendum). Hall signed or initialed every page of the PSA and Addendum. Hall testified that Stern told him to read the contract and said he could later have an attorney review it. In section 9.11 of the Addendum there is a blank for the deadline for seller to accept the PSA which is filled in by hand with a deadline of 5:00 p.m. on December 22, 2014.

On January 5, 2015, STCA signed and initialed the PSA and Addendum. Section 2.2 of the Addendum indicated that the "Effective Date" for the PSA was five business days after mutual acceptance. Hall's attorney had five business days after mutual acceptance of the PSA and Addendum before they bound either party. If Hall's attorney raised objections by that date, the PSA would be terminated, and STCA's earnest money would be returned to STCA, "unless the parties reach[ed] written agreement within 5 business days thereafter." If Hall's attorney approved or did not timely raise objections, then the PSA and Addendum would be deemed approved. The PSA advises both parties to seek an attorney.

The Addendum states that "notwithstanding" certain other provisions, the earnest money could be available to pay for counsel for Hall to review the agreement. Section 3.5. of the Addendum provided that the closing agent is authorized by both STCA and Hall to disburse directly to Hall's attorney up to $5,000 of the earnest money one time only after the Effective Date, upon written demand by Hall's attorney.[7]

---

[7] Hall disputes the characterization of the Addendum as providing an advance of earnest money for attorney fees, arguing that by the time the earnest money would be released to Hall, the PSA would already be binding.

The purchase price for the Sammamish Property was $1,251,000.00. This amounted to $900,000.00 per acre. The earnest money totaled $5,000.00.

Section 9.7. of the Addendum stated that STCA would pay JLS a facilitation fee pursuant to a separate written "Facilitator Agreement" and notes that JLS was not STCA's agent. Section 9.9. prohibited Hall from disclosing the existence of the PSA or any of its terms or provisions prior to closing or termination of the PSA.

Section 5.1 of the Addendum provided that starting on the effective date, Hall warranted and represented to STCA to the best of his knowledge after inquiry that the Sammamish Property contained no material physical or mechanical defects. Additionally, Hall warranted and represented that the Sammamish Property was not in violation of any federal, state, or local law relating to hazardous materials, and there were no underground storage tanks located on the property unless otherwise disclosed.

Section 4.1. of the Addendum required Hall to complete a "Form 17" disclosure statement and deliver it to STCA within five days after the PSA's effective date. Hall completed and executed the Form 17 disclosure statement on December 22, 2014. Hall answered "I don't know" to all questions in the environmental section, including questions concerning the existence of soil or groundwater contamination. Hall testified that Stern spoke with him about the Form 17 disclosures and advised him to "just be honest," and Hall completed the form to the best of his ability. A later amendment set the original closing date to occur more than two years later, in July 2017.

Soon after entering into the PSA, Hall learned from Jason Dahners that the Dahners family had not sold their property to STCA, and Hall became upset. In February 2015, Hall contacted an attorney about unwinding the PSA. Nothing in the record discloses that anything came of this consultation. On February 19, 2015, Karen Dahners rejected a revised offer and ended negotiations with STCA. Ms. Dahners copied her letter to Stern.

On May 29, 2015, Stern drafted a proposed e-mail to send to Samwick on Hall's behalf. Hall had spoken with Stern that morning and had expressed his dissatisfaction about entering into the PSA. Stern acknowledged that he and Hall started discussing the potential sale of the Sammamish Property "several years ago," and the pair "surmised that [Hall's] property and the adjoining parcels belonging to Urban Masset and Jason Dahners would probably end up being sold to the same buyer and would close at about the same time. We also concluded that due to their similarities they would probably end up being sold for similar prices." The e-mail ended with Hall's request for modification of the PSA to reflect these considerations, and proposed a solution to maintain the PSA, but modify the selling price and closing date to reflect the terms "finally agreed upon" by the Massets' and Dahners family's parcels. Stern sent this draft e-mail to Hall for approval before submitting it to Samwick, but Hall never responded to Stern and the record does not disclose the e-mail was sent to STCA.

STCA and JLS entered into a "Facilitator Agreement" more than a year later in September 2016. Section 1 acknowledged that John L. Scott, acting through its brokers, assisted STCA in procuring fully executed PSAs for certain real property

in Sammamish.  The Facilitator Agreement listed specific properties that JLS had assisted STCA in acquiring, including Hall's.  The Facilitator Agreement stated it was not an agency agreement and its purpose was to define payment for compensation only.  It stated STCA understood and acknowledged that JLS would represent either the property owner (seller) or neither party in any transaction.

Hall had extensive difficulty removing his belongings from the property before closing.  Hall also suffered significant medical issues.

Three years after Hall sold the Sammamish Property, the Massets sold their property and received $1.4 million per acre.  The record does not identify the buyer. Around the same time, the Dahners family sold their property, also to an unidentified buyer.  Hall testified he did not know how much per acre the Dahners family received, but he claimed he would not be surprised to learn it was for more per acre than he received.  Hall relies on information in a declaration by his counsel, discussed below, which ostensibly would establish that the Dahners family sold for a greater price per acre than Hall did.  Hall acknowledged that the real estate market had appreciated between the time he sold and the time the Dahners family and the Massets sold.

Because Hall did not close timely, STCA filed a lawsuit against Hall on July 18, 2017, for specific performance to complete the sale of the Sammamish Property.  Prior to closing, STCA discovered both an underground storage tank and the need for environmental remediation.  Hall and JLS agree the court ordered specific performance, together with payment of costs associated with cleanup of the property and litigation expenses totaling about $600,000.

13

On September 28, 2020, Hall filed his first amended complaint for damages against JLS. Hall generally asserted that JLS breached the duty of loyalty an agent owes to a principal by purporting to represent Hall while simultaneously serving the interests of STCA. Hall asserted claims for breach of contract, breach of JLS's duties as real estate professionals under chapter 18.86 RCW, misrepresentation, and violation of the CPA. Hall's original complaint described his misrepresentation claim as one for "negligent misrepresentation." In the amended complaint, he recharacterized this claim as one for "misrepresentation," without specifying whether he asserted a negligent or intentional misrepresentation claim.

Hall presented an expert, Ruth deMille. In her deposition testimony, deMille did not testify to any particular standard of care or to any breach of an applicable standard of care by JLS. However, deMille testified that Stern should have (1) given Hall more time to review the PSA, (2) gotten Hall more than $5,000.00 in earnest money, and (3) not allowed Hall to make improvident warranties regarding the property.

On June 18, 2021, the superior court dismissed all of Hall's claims on summary judgment. Hall appeals.

II

A party seeking summary judgment bears the initial burden to show the absence of a genuine issue of material fact. Young, 112 Wn.2d at 225. This burden may be met by showing an absence of evidence to support the nonmoving party's burden of proof at trial. Id. at 225 n.1. Then, the burden shifts to the nonmoving party to show the existence of a genuine issue of material fact. Id. at

225.  An order granting summary judgment is reviewed de novo.  Id. at 226.  The court views the evidence in the light most favorable to the nonmoving party, in this case, Hall.  Id.

A

Hall's amended complaint asserted the following claims against JLS: breach of contract, breach of duties under chapter 18.86 RCW, misrepresentation, and violations of the Washington CPA.  Hall does not brief his breach of contract claim on appeal, so the dismissal of that claim is not before this court.  RAP 12.1(a); Wash. Pro. Real Estate, LLC v. Young, 163 Wn. App. 800, 818 n.3, 260 P.3d 991 (2011) (declining to decide a case on the basis of issues that were not set forth in the parties' briefs).  Hall does not argue on appeal that we should find he has presented evidence supporting a claim for negligent misrepresentation, but rather argues exclusively that he presented evidence supporting fraudulent, i.e. intentional, misrepresentation.

Hall asserts a claim for the first time on appeal that JLS engaged in the unauthorized practice of law.  Hall argues that JLS engaged in the unauthorized practice of law when allegedly giving legal advice on the terms of the September 16, 2014 offer and should be estopped from disclaiming that the standard of care of an attorney applied when JLS reviewed the PSA with Hall.  Generally, issues not raised in the trial court may not be raised on appeal.  Roberson v. Perez, 156 Wn.2d 33, 39, 123 P.3d 844 (2005).  This court may refuse to review any claim of error which was not raised in the trial court.  RAP 2.5(a).  The decision to do so is discretionary.  Roberson, 156 Wn.2d at 39.

The superior court record contains few references to Stern's alleged unauthorized practice of law. In a superior court filing, Hall briefly mentioned that Stern's "less than accurate advice" concerning a previous developer's offer was "perhaps contrary [to] the laws prohibiting the unauthorized practice of law." However, the claim is absent from Hall's amended complaint, and it is unrelated to the elements of the other claims Hall asserted. Other than citing to Cultum v. Heritage House Realtors, Inc. for the general proposition that real estate brokers carry additional duties when engaged in the practice of law, Hall cited to no facts or legal authority in the superior court to support the argument that JLS owed Hall an attorney's standard of care. 103 Wn.2d 623, 627, 694 P.2d 630 (1985). Because Hall did not sufficiently raise a claim based on the unauthorized practice of law in the superior court, we decline to address that claim.

The same is true of Hall's claim asserted for the first time on appeal that JLS breached a common law fiduciary duty to Hall. Hall did not plead a common law breach of fiduciary duty claim below, and he did not seek to assert it through any other means such as in his response to JLS's motion for summary judgment, so it is not properly before this court. See Pappas v. Hershberger, 85 Wn.2d 152, 154, 530 P.2d 642 (1975) (declining to consider an issue raised for the first time on appeal that was not properly raised or reserved in either the superior court or Court of Appeals).

Accordingly, we consider three claims to be properly before us on appeal: breach of duties under chapter 18.86 RCW, violation of the Washington CPA, and fraudulent misrepresentation. Because we conclude Hall fails to overcome

summary judgment on any of these claims, we need not and decline to reach Hall's arguments that the superior court erred in applying the independent duty doctrine or that he presented a question of fact on mitigation of damages. See Hall v. Am. Nat. Plastics, Inc., 73 Wn.2d 203, 205, 437 P.2d 693 (1968) ("[C]ourts of review are not obliged to decide all issues raised by the parties, but only those which are determinative.").

B

Both parties' briefing and evidence failed to adhere to CR 56 in ways that have created unnecessary difficulties for the superior court and this court. In deciding a summary judgment motion, a court does not weigh the evidence, but rather asks if the evidence shows the existence of a genuine issue of material fact which must be resolved by a trier of fact at trial. See Hungerford v. Dep't of Corr., 135 Wn. App. 240, 250, 139 P.3d 1131 (2006). In seeking summary judgment, it was JLS's initial burden to show that there were no genuine issues of material fact requiring a trial to resolve even when taking the evidence in the light most favorable to Hall. Young, 112 Wn.2d at 225-26.

1

JLS's summary judgment briefing in the superior court and its briefing on appeal largely fail to meet its initial burden to demonstrate that there were no genuine issues of material fact requiring a superior court to grant summary judgment. Rather than showing that Hall's evidence fails to support Hall's claims, JLS largely relies on its own self-serving evidence, such as declaration testimony by Stern, to the effect that Stern contends he satisfied his duties to Hall. Argument

based on the moving party's own self-serving version of events is particularly unhelpful to the court in assessing whether the nonmoving party's evidence is sufficient to require a jury trial.

In an appropriate case, a court may properly refuse summary judgment when the moving party fails to make an initial showing that there is not a genuine issue of material fact requiring trial. Hash v. Child.'s Orthopedic Hosp. & Med. Ctr., 110 Wn.2d 912, 915-16, 757 P.2d 507 (1988); White v. Kent Med. Ctr., Inc., 61 Wn. App. 163, 170, 810 P.2d 4 (1991). Nevertheless, despite the fact JLS's briefing consistently portrays the evidence in the light most favorable to itself, rather than as we must take it in that most favorable to Hall, we conclude that JLS marginally met its threshold burden on summary judgment. JLS meeting its burden shifts the burden to Hall to set forth facts that "would be admissible in evidence" showing " 'that there is a genuine issue for trial.' " Young, 112 Wn.2d at 225-26 (quoting CR 56(e)).

2

In opposition to JLS's motion for summary judgment, Hall's attorney, Mark Perez, submitted a declaration with 35 exhibits attached. Perez's declaration was not limited to attaching exhibits and describing relevant procedural history. Rather, for certain substantive factual assertions noted below, Hall relies on Perez's sworn statements that they are true.

An attorney's affidavit may be considered in ruling on a motion for summary judgment to the extent that it is based on testimonial knowledge. Am. Linen Supply Co. v. Nursing Home Bldg. Corp., 15 Wn. App. 757, 763, 551 P.2d 1038 (1976).

18

An attorney's affidavit is entitled to the same consideration as any other affidavit based upon testimonial knowledge. Id. To the extent that the affidavit contains the attorney's conclusions and other surplusage, it is to be disregarded. Id. However, the rest of the affidavit can appropriately be considered. Id.

An attorney's affidavit that merely relates certain factual assertions that have been made to him by a client constitutes hearsay and does not set forth facts that would be admissible in evidence. See Welling v. Mount Si Bowl, Inc., 79 Wn.2d 485, 489, 487 P.2d 620 (1971). When affidavits are offered to support the position of a party at summary judgment, the affidavits must conform to what the affiant would be permitted to testify to at trial. Blomster v. Nordstrom, Inc., 103 Wn. App. 252, 260, 11 P.3d 883 (2000). The court should not consider conclusory statements made by either party. Id. An affidavit that states beliefs formed on the basis of hearsay is not made on personal knowledge or admissible in evidence as required by CR 56(e) and need not be considered in a summary judgment proceeding. See State v. Evans Campaign Comm., 86 Wn.2d 503, 506-07, 546 P.2d 75 (1976).

Perez's declaration contains several conclusory and argumentative assertions concerning his personal interpretation of the exhibits attached. Regarding exhibit 18, Perez asserts—not Hall—that "Hall did not receive this email." Without referencing any specific exhibit, Perez asserts that "[i]n [his] review of the document produced by the Defendants, I can find no evidence that Defendants advised the Plaintiff to have Ralston review STCA's LOI or PSA." Again without referencing any specific exhibit, Perez cites to a "May 13 email"—

19

which we assume must be the May 13, 2014 e-mail from Stern mentioned above—in which he asserts JLS was approached by an unidentified developer, and states, "Based, on this information, I believe the unidentified developer referred to in the 2014 Defendants' emails, from January through September refer to Orcas." Regarding exhibit 28, Perez concludes, based on a group e-mail from Ralston to all the sellers who had opted for representation, that all of the prospective sellers who were part of another developer's assemblage that had retained attorney Ralston for that transaction also retained her to review STCA's offer. When discussing exhibit 35, Perez notes, "In my review of the documents produced by [JLS], I found an email exchange involving [JLS] and STCA, in which both sides acknowledge the confusing terms as to the attorney review period and release of earnest money."

As written, these statements are improper in an attorney's declaration submitted in opposition to a motion for summary judgment. They make conclusions or opinions on the exhibits, and in some cases purport to stand in for evidence that is simply not provided. These statements are not appropriately viewed as admissible evidence under CR 56(e) and may be disregarded on that basis. We nevertheless conclude that even if we were to consider these statements together with the balance of Hall's evidence, the superior court correctly dismissed Hall's claims on summary judgment to the extent those claims are properly before us.

III

Hall asserts that JLS violated chapter 18.86 RCW, which governs real estate brokerage relationships.

A

Brokers owe duties under RCW 18.86.030 to all parties to whom the broker renders real estate brokerage services. "Real estate brokerage services" are defined as "the rendering of services for which a real estate license is required under chapter 18.85 RCW." RCW 18.86.010(11). Chapter 18.85 RCW, which governs real estate licensure, defines "real estate brokerage services" to mean "any of the following services offered or rendered directly or indirectly to another, or on behalf of another for compensation or the promise or expectation of compensation." RCW 18.85.011(17). These "services" include negotiating or offering to negotiate, either directly or indirectly, the purchase or sale of real estate and advising buyers or sellers in connection with a real estate transaction. RCW 18.85.011(17)(b), (e). While the statute explains that the duties are not waivable, they are owed only when a broker is acting for " 'compensation or the promise or expectation of compensation.' " Beauregard v. Riley, 9 Wn. App. 2d 248, 259, 443 P.3d 827 (2019) (quoting RCW 18.85.011(17)).

A broker who performs real estate brokerage services for a buyer is a buyer's agent unless the broker's firm has appointed the broker to represent the seller pursuant to a written agency agreement between the firm and the seller, in which case the broker is a seller's agent. RCW 18.86.020(1)(a).

21

A seller's agent owes several, nonwaivable duties to all parties under RCW 18.86.030(1) and RCW 18.86.040(1). The RCW 18.86.030(1) duties include the duty to (a) exercise reasonable skill and care, (b) deal honestly and in good faith, and (d) disclose all existing material facts known by the broker and not apparent or readily ascertainable to a party. The RCW 18.86.040 duties include (a) exhibiting loyalty to the seller by taking no action that is adverse or detrimental to the seller's interest in a transaction, (b) timely disclosing any conflicts of interest, and (c) advising the seller to seek expert advice on matters relating to the transaction that are beyond the agent's expertise. The duties imposed under chapter 18.86 RCW are defined as statutory duties and not fiduciary duties. RCW 18.86.110.

B

Hall argues that deMille's testimony creates a genuine issue of material fact on the issue of breach under RCW 18.86.030(1)(a) and RCW 18.86.030(1)(d). We disagree.

1

For his claim under RCW 18.86.030(1)(a), Hall was required to show that he was damaged by a failure by JLS to exercise reasonable care and skill.

Before Hall and JLS entered into the SRA on December 12, 2014, the brokers' duties owed to Hall under RCW 18.86.030 potentially arose as early as September 16, 2014. On September 16, 2014, Stern reviewed and advised Hall on a contract sent from another developer, confirmed to Hall that he agreed to represent Hall, and confirmed that he would charge Hall a four percent

commission. The parties do not dispute the brokers' agency relationship arose when Hall entered into the SRA for the STCA transaction. At that time, Hall did not ask any questions of Stern about the contract before signing it or even after signing the amendment to the PSA almost a month later. Hall testified Stern advised him to retain counsel to review the terms of an agreement to sell the Sammamish Property. Hall was clear that Stern gave him this advice at least once in 2012. Hall additionally testified Stern gave him this advice with respect to the PSA with STCA in 2014.

Hall's expert, deMille, testified that Stern should have given Hall more time to review the PSA. Hall testified that he read the PSA hurriedly. Hall admitted that between the time he signed on December 22, 2014, and the day of his deposition on May 5, 2021, he did not go back and read that PSA more thoroughly. There is no evidence supporting a conclusion other than that Stern advised Hall to retain counsel and read the PSA. There is also no evidence that Hall lacked adequate time to read the PSA if he wished to do so when it was presented to him on December 22, 2014. After he signed the PSA, Hall had two weeks in which he could have reviewed the PSA between his signing on December 22, 2014, and STCA's signing on January 5, 2015, and as well Hall's further signing the amendment to the PSA on January 17, 2015. Although deMille is evidently critical of this timeline, she does not articulate in what way it violates any applicable standard of care. Hall's evidence does not show that JLS failed to exercise reasonable care and skill with respect to the amount of time which Hall was given in which to review the PSA.

In her testimony, deMille opined that Stern should have asked for $10,000 in earnest money. The parties dispute the intent of the PSA's providing for $5,000 in earnest money. Stern maintains that the earnest money was intended to permit Hall to cover the expense of hiring counsel to review the document. Hall counters that he needed the earnest money as a means to address a foreclosure of one of his other properties. Nevertheless, we take Hall's reliance on deMille's testimony as suggesting the inference that if Stern had obtained a greater amount of earnest money, Hall could have retained counsel to review the PSA. However, this dispute is not material to any issue that needs to be decided, because it is undisputed that Hall received the earnest money and did not use it to retain counsel. Instead of using the $5,000 he received from STCA to hire an attorney to review the PSA, Hall funded other expenses and said he did not have enough money to pay for an attorney. Stern could not have known that Hall needed more earnest money to hire an attorney if Hall did not use the $5,000 he already received to try and retain one. Hall testified that he did not specifically remember telling Stern that he did not have enough money to hire an attorney. Finally, Hall presents no evidence that STCA or any buyer would have agreed to higher earnest money.

Additionally, deMille testified that a broker is obligated to present the offer as written and walk through the offer in its entirety with the client so they have a full understanding of it. She also testified that the duty of a broker with regard to complicated provisions in a contract is to have the client have those provisions reviewed by an attorney so the client fully understands them. And, deMille acknowledged that the earnest money was earmarked for obtaining counsel.

24

There can be no dispute that Stern advised Hall to seek counsel about the PSA on at least one occasion and possibly more, Hall had time in which to do so after receiving the PSA, and Hall received $5,000 in earnest money that he did not use to retain counsel. This record does not support a conclusion that JLS failed to exercise reasonable care and skill with respect to referring Hall to provisions in the PSA requiring attorney review.

Finally, deMille testified Stern should have cautioned Hall against the improvident warranties regarding the Sammamish Property. Hall was free to ask Stern questions about the provisions of the PSA, including the warranties section, but did not do so. As shown when Hall asked Stern for advice on another contract he received in September 2014, Stern provided detailed advice on particular sections and clauses of that agreement. For the PSA with STCA, however, Hall asked no questions and signed the PSA after only hurriedly reading it. Hall acknowledged that Stern advised him to complete the Form 17 disclosure form honestly, and Hall completed Form 17 to the best of his ability. The record does not support a conclusion that Stern failed to exercise reasonable care and skill with respect to explaining the warranties provision in the PSA.

Hall implies that if he had been advised against making the warranties concerning the condition of the Sammamish Property, he would not have entered into the PSA with STCA. But he presents no evidence allowing a determination of any amount of damages incurred by entering into the PSA as opposed to not doing so. Hall presents no evidence of the price any willing buyer would have paid for the Sammamish Property subject to the need later discovered for substantial

25

environmental remediation. The record does not support a conclusion that Hall could have realized any particular price per acre different from the price he received under the PSA, let alone the price received three years later by neighbors selling different properties having different conditions affecting (or not affecting) them.

Hall presented no evidence supporting a genuine issue of material fact on whether JLS breached the duty of RCW 18.86.030(1)(a). On this claim, summary judgment was appropriate.

2

Hall argues that pursuant to RCW 18.86.030(d), JLS was obligated to disclose as a "material fact[]" that was not "readily ascertainable" Samwick's "disbarment" in Oregon for committing financial fraud. Expert deMille testified that given Samwick's credibility and business practice issues in Oregon, JLS pursuing STCA as the buyer gave her concern.

If possible, we must give effect to the plain meaning of a statute as an expression of legislative intent. Jametsky v. Olsen, 179 Wn.2d 756, 762, 317 P.3d 1003 (2014). This plain meaning is derived from the context of the entire act as well as any related statutes which disclose legislative intent about the provision in question. Id. We need not consider outside sources if a statute is unambiguous. Id.

A provision is ambiguous if it remains susceptible to more than one reasonable interpretation. Tingey v. Haisch, 159 Wn.2d 652, 657, 152 P.3d 1020

(2007). When a term has a well accepted, ordinary meaning, a regular dictionary may be consulted to determine the term's definition. Id. at 658.

A "material fact" means information that substantially adversely affects the value of the property or a party's ability to perform its obligations in a real estate transaction, or operates to materially impair or defeat the purpose of the transaction. RCW 18.86.010(9).

The phrase "readily ascertainable" used in RCW 18.86.030(d) is undefined. *Webster's* defines "readily" to mean "with fairly quick efficiency : without needless loss of time : reasonably fast" or "with a fair degree of ease : without much difficulty : with facility." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1889 (2002). "Ascertain" means to "find out or learn for a certainty (as by examination or investigation) : make sure of : discover." WEBSTER'S at 126. Therefore, if a party could discover information quickly or easily, that information is "readily ascertainable".

Information concerning Samwick's "disbarment" was both immaterial to Hall's transaction with STCA and readily ascertainable. Hall presents no evidence of the circumstances of Samwick's Oregon "disbarment" nor any related dishonesty by Samwick towards Hall or in Hall's transaction with STCA. This prevents any conclusion that the "disbarment" has any impact on the value of the Sammamish Property, any party's performance of their obligations under the PSA, or the purpose of transferring the property from Hall to STCA. This makes the "disbarment" immaterial under RCW 18.86.010(9). Further, as Stern and Stevenson acknowledged in their November 22, 2014 e-mail exchange, there were

at least 10 pages in Google's search results concerning Samwick's "disbarment". Hall could have easily found that information about Samwick through the internet. Additionally, there is no evidence in the record to support Hall's claim that Stern and Stevenson encouraged Samwick to form STCA because there would be little information about the company on the internet. Rather, the November 22, 2014 e-mail exchange between Stern and Stevenson merely acknowledges that there is not much information on Orcas and no information on STCA on the internet, not that Samwick should form STCA to attempt to hide prior misconduct.

Hall presented no evidence supporting a genuine issue of material fact on whether JLS breached the duty of RCW 18.86.030(1)(d). On this claim, summary judgment was appropriate.

C

Hall argues that deMille's testimony creates a genuine issue of material fact on the issue of breach under RCW 18.86.040(1)(a) and RCW 18.86.040(1)(b).

1

JLS argues that the communications Hall relies on for his argument concerning the duty of loyalty occurred before JLS and Hall executed the SRA and therefore before JLS's duty of loyalty as Hall's agent arose. We agree.

JLS's duty of loyalty to Hall under RCW 18.86.040(1)(a) arose on December 12, 2014, when Hall signed the SRA, which was later fully executed. In her testimony, deMille admitted that the communications between Stern and STCA on how to approach a particular seller, Hall, occurred before Hall signed the SRA with JLS and Stern. And deMille testified that, before the SRA was signed, an "implied

28

agency" relationship arose between Stern and Hall. She reasoned that during the interim period between Stern first meeting with Hall and Hall signing the SRA, Stern's communications and actions would lead Hall to believe that Stern was ultimately going to be his agent. Although the common law applies to JLS and Hall to the extent not displaced by statute pursuant to RCW 18.86.110, any "implied agency" arising under chapter 18.86 RCW is unsupported by statute and case law. Here, JLS's discussions with STCA prior to the SRA's execution do not support a breach of the statutory duties. Moreover, Stern and Stevenson disclosed that they were discussing terms with potential developer buyers with the intent of engaging multiple sellers, as they would obviously need to be in order to carry out the stated intention of selling properties in aggregations to developers vying for the town center project.

Stern communicated directly to Hall about their relationship on two occasions before the SRA's execution. On November 13, 2013, in an e-mail to Hall, the Massets, and Jason Dahners, Stern stated, "It's clumsy for me to tell a prospective buyer that I am representing you when I don't have anything 'official' in writing." The next instance occurred almost a year later, in an e-mail on September 16, 2014, when Hall asked Stern for his thoughts on an offer he received from another developer. Stern wrote, "He wants you to pay him 5% and will be representing the buyer? I've already agreed to represent you and would charge 4%, the same as your neighbors." Stern's comments made clear that their discussions concerned Stern's future representation of Hall, not that Stern actually represented Hall at those times in 2013 and 2014. Additionally, it was clear in the

November 13, 2013 e-mail that Stern noted that he would need something in writing before he could say that he is Hall's representative to potential buyers. Stern's representation of Hall began with the SRA's execution on December 12, 2014.

Much of the communication between Stern and Hall since they met in person in 2013 up until the SRA's execution in late 2014 was initiated by Stern, and left no doubt about Stern's actions towards properties within the town center development area. In several e-mails within that time period, Stern kept Hall apprised of ongoing discussions with various developers interested in the town center project. On April 26, 2013, Stern contacted Hall after being asked to do so by a developer interested in presenting an offer on Hall's property. On January 8, 2014, Stern sent an e-mail to Hall and several of his neighbors, including Jason and Karen Dahners and the Massets. Stern notified the group that he and Stevenson were meeting with a developer and the developer asked the brokers to give "a brief tour of the properties in our quadrant after that meeting." The city of Sammamish referred a "large developer" to Stern and Stevenson, who had been approached by the developer the previous December. On September 8, 2014, Stern e-mailed Hall to inform him that he met with the principal for Orcas, had promised to get back to Hall with the results, and that Orcas was interested in purchasing the remaining portions of the town center that had not been sold. It is clear that Stern had other communication with Hall, but the content of those conversations is not in the record.

Stern communicated with Hall at his own initiation before any agency or implied agency relationship arose in December 2014. Moreover, Stern communicated his intention to negotiate sales of multiple properties to interested developers. This activity, occurring before an agency relationship was established and with disclosure of Stern's intentions, does not support a conclusion that Stern breached a duty of loyalty to Hall. Hall presented no genuine issue of material fact that JLS and the Brokers breached their duty under RCW 18.86.040(1)(a). On this claim, summary judgment was appropriate.

2

Hall argues that JLS breached its duty under RCW 18.86.040(1)(b) when they failed to disclose a conflict of interest. We disagree.

Stern disclosed his working relationship with Orcas and/or STCA to Hall several times. On September 8, 2014, Stern e-mailed Hall to inform him that he met with the principal for Orcas, and it was interested in purchasing the remaining portions of the town center that had not been sold. On October 14, Stern e-mailed Hall to inform him that he met with the principal of Orcas and its financing source. On November 4, 2014, over a month before Hall signed the SRA, LOI, and PSA, Stern e-mailed Hall and the Massets, and reminded them that he and Stevenson had been working with Orcas for about a year. On November 15, 2014, Stevenson e-mailed Hall and reminded him that she and Stern had spent the past week negotiating with Samwick. Stevenson noted that Samwick was a principal of STCA, and that STCA was formed as a result of several meetings and tours the brokers gave Samwick and Orcas.

At least once a month for three months before Hall signed the SRA, LOI, and PSA, Stern and Stevenson notified Hall that they were meeting with representatives from a developer to broker sales of property within the town center project. Hall testified that he received the November 15, 2014 e-mail from Stern but had no specific recollection that he reviewed that e-mail. Hall also testified that he received about six or seven e-mails from Stern stating that Stern would be showing developers or engineers around Hall's or his neighbors' properties. Several of these e-mails specifically named Orcas or STCA as the developer Stern was meeting with. To the extent there was one, Hall cannot reasonably argue that JLS failed to disclose a conflict of interest with STCA when Hall received several e-mails months before the SRA, LOI, and PSA were executed that detailed the work Stern and Stevenson were doing with STCA.

Hall presented no genuine issue of material fact that JLS breached its duty under RCW 18.86.040(1)(b). On this claim, summary judgment was appropriate.

IV

Under the CPA, unfair methods of competition and unfair or deceptive acts or practices are unlawful. RCW 19.86.020. To prevail on a CPA claim, the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) public interest impact, (4) injury to plaintiff in his or her business or property, and (5) causation. Klem v. Wash. Mut. Bank, 176 Wn.2d 771, 782, 295 P.3d 1179 (2013). A claim under the CPA may be predicated on a per se violation of the statute, an act or practice that has the capacity to deceive substantial portions of the public, or an unfair or deceptive act or practice not regulated by

statute but in violation of public interest. Id. at 787. We conclude that Hall fails to show causation under the CPA, and we do not reach any other elements of this claim.

JLS argues that there is no evidence JLS caused Hall's claimed damages as JLS was not responsible for Hall's performance of his contractual obligations. Hall must show that any breach of duty was the proximate cause of his claimed injury. Boguch v. Landover Corp., 153 Wn. App. 595, 609, 224 P.3d 795 (2009). At issue is the cause in fact component of proximate cause. See Beauregard, 9 Wn. App. 2d at 255-56. To show cause in fact, the plaintiff must show that "but for" the defendant's breach, the plaintiff's alleged injury would not have occurred. Id. at 256.

In Beauregard, the court held that the plaintiffs failed to establish that the defendant's actions were the proximate cause of their claimed injuries and affirmed the dismissal of those claims on summary judgment. Id. at 250. The Beauregards sued their former real estate agent, Riley, for negligence, breach of statutory real estate broker duties, and violations of the CPA. Id. The court noted that while the plaintiffs alleged 10 ways Riley breached her duty as their agent, they failed to identify a prospective buyer who would have been willing to purchase the Beauregards' property within their desired price range but for Riley's negligence. Id. at 257. The court concluded that the Beauregards failed to establish proximate causation, an essential element to their negligence, statutory duty, and CPA claims. Id. at 258.

Hall's case is similar to Beauregard. Hall offers no evidence that he was likely to obtain any price from a willing buyer other than the one he received, let alone the same price per acre as the Dahners family or the Massets. When Hall asked Stern to review an earlier offer from another buyer, the price was for $1 million, approximately a quarter of a million less than the amount STCA offered. There is no evidence that Hall at any time could have received a higher price than the one STCA offered. Hall's comparison of the sale price for the Sammamish Property to his former Sammamish neighbors' property sales is unsupported by competent evidence. Hall admitted that the real estate market appreciated significantly in the two to three years following his PSA. Hall fails to put forth evidence that would demonstrate that but for JLS's alleged misconduct he would likely have sold his property on terms similar to those on which his neighbors sold, in similar market conditions, or without incurring costs associated with his property's environmental condition.

Additionally, Hall had time to review the PSA. When a contract is plain and unambiguous, a person who has signed without reading it is nevertheless bound by its terms so long as there was reasonable opportunity to examine the contract in as great a detail as the person signing cared, and the contracting party has failed to do so for personal reasons. McCorkle v. Hall, 56 Wn. App. 80, 83, 782 P.2d 574 (1989). Hall had almost a month between the time he signed the PSA and Addendum until the time he signed the Amendment on January 17, 2015. Hall received $5,000 in earnest money from STCA, but instead of using that money to hire an attorney to review the PSA during a window afforded to him to terminate

the contract, Hall spent those funds on other expenses. Hall's own actions, not JLS's, caused any damages he incurred from lost personal property, environmental remediation reimbursement, and litigation expenses.

Hall does not present evidence that would support a conclusion that any injury he incurred was the result of acts or omissions by JLS. The superior court properly granted JLS summary judgment on Hall's CPA claim.

V

The last claim before us is Hall's claim that JLS engaged in fraudulent misrepresentations. Hall's original complaint characterized this claim as one for negligent misrepresentation. In his amended complaint, Hall characterized this claim as "misrepresentation," without further specification. Hall is clear in his appellate briefing, however, that he now rests on a claim of fraudulent misrepresentation.

Although never acknowledged by Hall, to establish fraudulent misrepresentation, he must prove nine elements by clear, cogent, and convincing evidence: (1) representation of an existing fact, (2) the materiality of the representation, (3) the falsity of the representation, (4) the speaker's knowledge of the falsity of the representation or ignorance of its truth, (5) the speaker's intent that the listener rely on the false representation, (6) the listener's ignorance of its falsity, (7) the listener's reliance on the false representation, (8) the listener's right to rely on the representation, and (9) damage from reliance on the false representation. Baertschi v. Jordan, 68 Wn.2d 478, 482, 413 P.2d 657 (1966). We previously found that an element of fraudulent misrepresentation refers to a

plaintiff's "reasonable reliance" on the representation. See Hawkins v. Empres Healthcare Mgmt., LLC, 193 Wn. App. 84, 100, 371 P.3d 84 (2016). An omission may constitute a misrepresentation if the party had a duty to disclose information and breached this duty. Landstar Inway Inc. v. Samrow, 181 Wn. App. 109, 124, 325 P.3d 327 (2014).

Hall's evidence fails to show the reliance element. It was not reasonable for Hall to rely on any representation that Stern was not working with or speaking to STCA during this transaction. In three e-mails that predated Hall's several meetings with Stern in December 2014, Stern explicitly stated that he had been working with STCA for about a year and in that time had had over a dozen meetings and town center tours with their representatives. These e-mails leave no doubt about the fact that Stern was working to arrange the sales of many properties to a developer in connection with the Sammamish town center project. Moreover, one of the three meetings Hall attended with Stern in December 2014 was one that Stern had arranged for him with STCA, the very party Hall now contends he did not appreciate Stern was working with on the town center project.

Hall offers virtually no substantive rebuttal to the fact Stern disclosed the very matters he alleges were suppressed other than to testify in a declaration prepared years later and in the weeks preceding the summary judgment hearing that he did not recall receiving one of Stern's comprehensive e-mails. But even accepting Hall's declaration as true, that Hall may have neglected to read Stern's disclosure does not alter the fact Stern did disclose the nature of his efforts related to the town center project, and he did it well before Hall nevertheless agreed to the

PSA Stern later presented. Finally, it was not reasonable for Hall to rely on any representation that Hall would receive the same terms or price per acre as the Dahners family. Hall admitted that no such terms were present in the PSA, he points to no evidence that would support him believing the PSA would nevertheless provide for such guaranties, and he did not ask that they be added. Hall nevertheless signed the PSA. On May 29, 2015, Stern drafted an e-mail about Hall's concerns that he was not getting the same price as the Massets and the Dahners family, and Stern sought Hall's permission to send the e-mail to Samwick. Hall never responded.

Because Hall cannot establish the reliance element, Hall's fraudulent misrepresentation claim fails as a matter of law. Further, even if Hall were to characterize his claim as one for negligent misrepresentation, his failure to offer evidence supporting the reliance element would foreclose that claim as well. Laws. Title Ins. Corp. v. Baik, 147 Wn.2d 536, 545, 55 P.3d 619 (2002) (elements of negligent misrepresentation).

VI

Last, Hall assigns error to the superior court award to JLS of reasonable attorney fees and costs pursuant to the prevailing party fee provision in the SRA.

A

Hall argues that the superior court erred when it awarded JLS all of its attorney fees pursuant to the SRA without a segregation analysis, relying on case law establishing that the claims Hall asserted are subject to segregation of prevailing party attorney fees in light of the language in the parties' contract. We

agree. The superior court should have required JLS to analyze the segregation of fees associated with certain claims outside the scope of the prevailing party provision in the contract.

Generally, parties bear their own attorney fees unless otherwise provided by contract, statute, or recognized ground in equity. Mellor v. Chamberlin, 100 Wn.2d 643, 649, 673 P.2d 610 (1983). Whether a party is entitled to attorney fees is an issue of law that this court reviews de novo. Little v. King, 147 Wn. App. 883, 890, 198 P.3d 525 (2008).

When an action in tort is based on a contract containing an attorney fee provision, the prevailing party is entitled to attorney fees. Douglas v. Visser, 173 Wn. App. 823, 835, 295 P.3d 800 (2013). Under Washington law, for the purposes of a contractual attorney fee provision such as the one at issue in this case, an action is on a contract if the action arose out of the contract and if the contract is central to the dispute. Seattle First Nat. Bank v. Wash. Ins. Guar. Ass'n, 116 Wn.2d 398, 413, 804 P.2d 1263 (1991). Where a party alleges a breach of a duty imposed by a source other than the contract, the action is not on a contract, even if the duty would not exist in the absence of a contractual relationship. Boguch, 153 Wn. App. at 600. A defendant who successfully defends may be a prevailing party. Mike's Painting, Inc. v. Carter Welsh, Inc., 95 Wn. App. 64, 68, 975 P.2d 532 (1999). The reasonableness of attorney fees is a factual question depending upon circumstances of a given case, and the trial court has broad discretion in fixing attorney fees. Schmidt v. Cornerstone Invs., Inc., 115 Wn.2d 148, 169, 795 P.2d 1143 (1990).

In Edmonds, the court upheld an award of attorney fees to Edmonds who sued her realtor for breach of fiduciary duty, among other things. Edmonds v. John L. Scott Real Estate, Inc., 87 Wn. App. 834, 855, 857, 942 P.2d 1072 (1997). Edmonds's realtor failed to return her earnest money after she withdrew from a real estate transaction, and instead disbursed it to himself and the seller. Id. at 842-43. The court concluded that Edmonds's action was on the contract for the purpose of recovering attorney fees under a contractual fee shifting provision because her claims arose directly out of duties created by her broker/buyer agreement, the earnest money agreement, and the broker's drafting of the earnest money agreement. Id. at 855-56.

In contrast, in Boguch, the court held that the realtors were not entitled to an award of fees for defending against Boguch's tort claims. 153 Wn. App. at 619. Included in the agreement between the parties was an attorney fee provision. Id. at 607. The court found that Boguch's claim that the realtor violated duties under chapter 18.86 RCW was a tort claim, rather than a claim on the contract. Id. at 617. The court reasoned that although the realtor's duty to Boguch arose because the parties entered into a contractual relationship, the listing agreement itself did not specify the duty of care that the realtor was required to provide. Id. Additionally, Boguch's claimed right of recovery was not based on the contract itself. Id. at 618. Boguch alleged that the realtors were negligent in posting an inaccurate depiction of his property's boundary lines on the Internet and that, but for their negligence, he would have sold the property sooner and for a higher price than he eventually did. Id. at 603. Boguch also claimed that the realtors breached

their professional duties to exercise reasonable skill and care under RCW 18.86.030. Id. Finally, Boguch brought an unspecified breach of contract claim. Id. Boguch sought to recover for breach of the common law and statutory duties based on the realtors' inaccurately portraying the boundaries of the property in an online listing, not for the realtors' failure to perform a contractual duty. Id. at 617.

The Boguch court distinguished Edmonds by noting that Boguch did not claim that the realtors breached any particular provision of the contract or failed to perform the obligation to advertise his property for sale. Id. at 618. This court vacated the superior court's award of attorney fees and remanded for recalculation of the award after segregating fees associated with Boguch's contract and other claims. Id. at 600.

Here, both Edmonds and Boguch are applicable. The SRA between Hall and JLS included an attorney fees clause that stated, "In the event either party employs an attorney to enforce any terms of this Agreement and is successful, the other party agrees to pay reasonable attorneys' fees." In his amended complaint, Hall's breach of contract claim alleged that JLS failed to represent Hall. This directly implicated the SRA's clause creating an agency relationship and alleged failure to perform a contractual duty that therefore arises on the contract, similar to Edmonds. JLS is entitled to reasonable attorney fees for Hall's breach of contract claim.

However, Hall's claim for breach of duties under chapter 18.86 RCW is based on alleged violations of statutory duties, not any duty arising from the SRA's terms. Similarly, Hall's CPA claim is based on alleged unfair or deceptive acts or

practices separate from any of the SRA's terms. Hall argues in his brief that the alleged chapter 18.86 RCW violations constitute unfair or deceptive acts or practices under the CPA. The SRA provides that if STCA is represented by Hall's brokers, Hall consents to his brokers acting as dual agents. The alleged violations are based on statutory duties owed to Hall, not any duty arising from the SRA's terms. Finally, Hall's misrepresentation claim, whether characterized as intentional or negligent, was by JLS's own admission based on conduct occurring before the agency relationship was established in the SRA and amounted to a claim that Hall would not have entered into the SRA but for JLS's asserted misrepresentations. Similar to Boguch, JLS is not entitled to reasonable attorney fees for these claims.[8]

We vacate the superior court's fee award and remand for recalculation of the attorney fees and costs. In remanding for recalculation of attorney fees, we hold that JLS is entitled to attorney fees only on Hall's breach of contract claim, but not on Hall's chapter 18.86 RCW, CPA, and misrepresentation claims. We leave to the superior court to address in the first instance the appropriate segregation

---

[8] The record before this court reflects that JLS sought an award of fees and costs totaling $150,270.68, JLS included no discussion about segregation based on claims subject to expense-shifting versus other claims, Hall objected to the lack of segregation in response, and JLS denied any segregation obligation in reply. On appeal, Hall challenges the lack of segregation and JLS responds that none was required. Despite both parties' briefing the merits of the issue, neither party completed this court's record by designating the superior court's judgment awarding fees. It is apparent from the superior court's record that it entered judgment for defendants for $150,270.68 when only JLS's request for expenses remained to be determined. Judgment (January 27, 2022), https://perma.cc/S38C-XGNP. We exercise our discretion under RAP 9.10 to reach the merits as briefed by the parties despite the incomplete record, vacate the judgment to the extent of its awarding fees and costs, and remand for recalculation.

when a party is entitled to recover fees on some claims but not others according to the standards for segregating prevailing party attorney fees outlined in Boguch. 153 Wn. App. at 619-21.

B

JLS requests that it be awarded its reasonable attorney fees and costs incurred in this appeal. A party may be awarded attorney fees based on a contractual fee provision at the appellate level. Renfro v. Kaur, 156 Wn. App. 655, 666-67, 235 P.3d 800 (2010). The SRA includes a prevailing party provision for awarding attorney fees. JLS is entitled to attorney fees only on Hall's breach of contract claim, but that claim was not raised on appeal. Accordingly, we decline to award reasonable attorney fees on appeal to JLS.

VII

We affirm the superior court's order granting JLS's motion for summary judgment dismissing Hall's claims with prejudice. We vacate the superior court's judgment to the extent of its awarding attorney fees and costs to JLS and remand for recalculation of the attorney fees and costs in a manner consistent with this opinion. JLS shall recover costs on appeal under RAP 14.1(c).

_____
Birk, J.

WE CONCUR:

_____          _____
Chung, J.